Peelle, J.,
delivered the opinion of the court:
This action is to recover an allowance for a drawback on the exportation of boxes, alleged to have been wholly manufactured of materials imported, on which duties were paid, i. e., of box shooks imported from Canada and of nails manufactured in the United States out of steel rods imported from Europe.
The claimant bases its right to recover under the Act August 5,1861, section 4 (12 Stat. L., 292), Revised Statutes, section 3019, which reads:
“There shall be allowed on all articles wholly manufactured of materials imported, on which duties have been paid when exported, a drawback equal in amount to the duty paid on such materials, and no more, to be ascertained under such regulations as shall be prescribed by the Secretary of the Treasury. Ten per centum on the amount of all drawbacks so allowed shall, however, be retained for the use of the United States by the collectors paying such drawbacks, respectively.”
The shooks were imported under the Tariff Act March 3, 1883 (22 Stat. L., 491-502), which reads:
“Sec. 2502. There shall be levied, collected, and paid upon all articles imported- from foreign countries, and mentioned in the schedules herein contained, the rates of duty which are, by the schedules, respectively prescribed, namely:
“Casks and barrels, empty, sugar-box shooks, and packing boxes, and packing-box shooks, of wood, not specially enumerated or provided for in this act, 30 per centum ad valorem.”
And the same rate of duty is retained by the Act October 1, *98 1890, par. 228 (26 Stat. L., 683), and 1st Supp. to R. S., 2d ed., 828.
The claimant’s contention is that the boxes were wholly manufactured of materials imported, on which duties were paid, and that under the section of the statute quoted it is entitled to an allowance for a drawback equal in amount to the duty so paid less 10 per cent thereof.
The defendants’contention is that the boxes were not manufactured in the United States, for the reason that the shooks were conqilete boxes of foreign manufacture when imported, with the exception of nailing the parts together, and that the shooks were not “material” within the meaning of the statute.
The question presented is, therefore, as to whether the boxes exported were, in the language of the statute, “ articles wholly manufactured of materials imported, etc.”
There is no controversy, as we understand, but that the words “in the United States” should be read in the statute so that the section will read, “There shall be allowed on all articles wholly manufactured,”"in the United States, “of materials imported,” etc.
And this was the construction of the section given by the Secretary of the Treasury in the regulations and forms prescribed by him for the execution of the same, as will be seen by an examination "of finding vn.
The word “articles” appears in section 2502 (supra) and is sufficiently broad and comprehensive to include every item named specifically or in general terms in the several schedules thereunder. And the same is true as to the word in Revised Statutes, section 2503, concerning articles exempt from duty.
In speaking of the word “articles” as used in section 2602, etc., in the case of Junge v. Hedden (146 U. S., 233-239), the court said: “We agree with the circuit court that the word must be taken comprehensively, and can not be restricted to articles put in condition for final use, but embraces as well things manufactured only in part, or not at all.”
But will that construction apply to the word concerning exports for the benefit of drawback, as used in section 30191 We think not) and for the reason that the word in this section is qualified or restricted to “articles wholly manufactured,” in the United States, “of materials imported, on which duties have, been paid; ” if so, then such articles are complete in their man- *99 ufactnre — in condition for final nse — and tbis differentiates tbe meaning of tlie word as used in the two sections (2502 and 3019).
There is, however, no controversy in this case but that the boxes exported were articles manufactured and that the same were composed of materials imported; but were they manufactured in the United States, and were the shooks out of which they were made “materials” within the meaning of the statute?
Material may be defined generally to be any “matter which is intended to be used in the creation of a mechanical structure.” (71 Penn., 293; 36 Wis., 29, Bouvier.)
The words “articles” and “materials” both appear in the section, but in different connections, and we think it clear that Congress intended their use in a different sense.
The first, we think, was intended as “ articles ” complete in their manufacture; while as to the other we think unmanufac-tured “materials” was intended, or at least “materials” in such an unfinished state as to require the expenditure of a material amount, of labor in the United States to prepare and shape the same for use.
Otherwise the mere fastening together in the United States of imported manufactured material into form for use would constitute the manufacture of the articles exported for drawback, and this we do not believe was the purpose of the statute.
The word “manufacture” has been the subject of judicial interpretation a number of times. Most of the decisions, perhaps, have been in cases where the question involved was as to the classification of articles subject to duty under our various tariff laws. In this class of cases it has been held that “a trifling amount of labor is often sufficient to change the nature of the article and determine its classification.” (Saltonstall v. Wiebusch, 156 U. S., 601, 604; Arnold v. United States, 147 U. S., 494.)
But in the case of Kidd v. Pearson (128 U. S., 1-20), which arose under the prohibitory liquor law of Iowa, the court, in defining the distinction between manufactures and commerce, said, “Manufacture is transformation — the fashioning of raw materials into a change of form for use.”
The definition of “manufacture” there given was in line with the decision in the case of Hartranft v. Wiegmann (121 U. S., 609, 615), in which the court, in speaking of shells cleaned by acid and then ground on an emery wheel and intended for use *100 as ornaments, said: “They were still shells. They had not been manufactured into a new and different article, having a distinctive name, character, or use from that of a shell.”
In support of the definition here given, the claimant’s counsel has cited us to a number of other decisions, but as they are to the same effect we need not consider them.
So, to constitute a manufacture, there must be a change of form — a transformation of the materials used — “into a new and different article, having a distinctive name, character, or use from that of’’'the materials used.
With this judicial definition in mind, let us ascertain, if we can, the purpose of the statute under consideration, and then see if the articles manufactured come within its provisions.
First, it is quite evident that revenue was not the purpose of tin’s section, for in case the manufactured articles are exported, the duty paid on the materials of which such articles are composed is allowed as a drawback to the exporter less 10 per cent; and by the Act of March 3, 1875, section 3 (18 Stat. L., 340), it is provided, “That of the drawback on refined sugars exported allowed by section three thousand and nineteen of the Revised Statutes, only one per centum of the amount so allowed shall be retained by the United States.”
Ánd 1 per cent is the amount of duty to be retained under the provisions of the Act October 1, 1890, section 25 (26 Stat. L., 617).
In the case of Campbell v. United States (107 U. S., 407, 413) the court held that the purpose of the drawback provision was to make duty free imported material which was used in manufacturing where the manufactured product was exported for the benefit of drawback; so that it is quite clear that revenue was not the purpose of this statute.
Was it intended to encourage our domestic manufactures or export trade, or both?
That Congress have the power to regulate foreign as well as interstate commerce by prescribing the rules which shall govern the same is beyond question and needs no citation of authorities, but see Gibbons v. Ogden (9 Wheat., 1); Gloucester Ferry Co. v. Pennsylvania (114 U. S., 196), etc.
In the exercise of this power, Congress, by the statute, established a rule to the effect that imported dutiable material which has been transformed in the United States by the *101 process of manufacture as therein provided may be exported for the benefit of drawback.
It will be observed that no provision is made in the statute for a drawback when such manufactured products enter into consumption in tbe United States, so we conclude that the drawback provision was intended in part to promote our export trade in such manufactures; not, however, at the expense or sacrifice of domestic manufactures, for as a condition precedent to the right of such drawback, the articles exported therefor must have been manufactured in the United States, and, too, “of materials imported on which duties have been paid.”
The statute was not intended to encourage the importation of material to be used in manufactures when like material could be obtained in the United States, but in effect says to those engaged in domestic manufactures, if you import dutiable material for manufacturing purposes and transform the same into some manufactured product in the United States you may export such product with the benefit of drawback, but not otherwise.
We are therefore of the opinion that the controlling purpose of the statute was to foster and encourage domestic manufactures.
In Arnold v. United States (347 U. S., 494, 497) the court, in speaking of the tariff act 1890, said: “The idea which runs through this statute is well known to be that of protection to our manufactures.” And the same is true of the tariff act 1883. (Saltonstall v. Wiebusch, 156 U. S., 601, 604.) And wé have no reason to suppose that a different rule would be applied to section 3019, even though the degree or stage of manufacture of an imported article may be less than that required of articles exported for the benefit of drawback.
Certainly Congress did not intend by the provision that articles might be partially manufactured in the United States of imported dutiable material, then exported for the benefit of drawback, and their further manufacture completed in a foreign country, as this would manifestly defeat the purpose of the statute.
It is not sufficient under the statute to take measurement and cut cloth for the purpose, but the coat as well must be made in the United States to constitute it a manufactured article entitling the exporter thereof to the benefit of drawback.
*102 If we are correct in tbis it follows, we think, tbat Congress did not intend tbat materials imported in sucb an advanced stage of manufacture, as tbe sbooks were in tbis case, would bring tbe boxes, wbeu nailed together and trimmed, witbin tbe meaning and intent of tbe statute as articles manufactured in tbe United States.
Tbe sbooks are classed by tbe statute under wbiob they were imported witb oaslcs, barrels, and packing boxes, presumably finished products, and are dutiable at tbe same rate. So tbat bad tbe sbooks been nailed together and trimmed in Canada, as they were in tbe United States, and then imported as packing-boxes, tbe rate of duty would have been tbe same as tbat paid on tbe sbooks.
Tbis shows tbat Congress, by tbe classification they made, regarded box sbooks as finished or manufactured materials for some specific purpose; and when we examine tbe language used in tbe section, “Casks and barrels, empty, sugar-box sbooks, and packing boxes, and packing-box shooks, of wood,” etc., we must conclude tbat tbe purpose for which tbe sbooks were imported was for nailing together into boxes, and tbis tbe findings show was done.
So tbe finished condition of tbe sbooks, in fact, not only harmonizes witb tbe classification in tbe statute as stated, but is also in harmony witb tbe definition of tbe word “shook,” as given by lexicographers. (See the American Mechanical Dictionary.)
Tbe sbooks having been prepared in Canada complete for use, can it be said tbat tbe boxes fashioned therewith were manufactured in tbe United States? We think not.
Tbe preparation of tbe material was not only necessary to make tbe box, but was an esseutial and inseparable part of tbe manufacture thereof, under section 3019, for tbe reason tbat tbe box could not have been otherwise manufactured.
Material can not be transformed or fashioned “into a change of form for use ” without undergoing tbe process of manufacture necessarily incident to the article manufactured; so that tbe manufacture of a box necessarily includes as a part thereof tbe manufacture or preparation of tbe materials therefor.
We are therefore of tbe opinion tbat the manufacture of tbe boxes began when tbe materials therefor were prepared and shaped for tbe purpose in Canada. Tbe utility of tbe material *103 was thereby limited to the purpose for which it was prepared; and in this respect is unlike the case of Worthington v. Robbins (139 U. S., 337).
The mere nailing of a box together witli material prepared for the purpose and then trimming the same, as set forth in the findings, is not, per se, a transformation of such material, but is merely a completion of the transformation which began with the preparation of the material therefor.
To construe the statute as contended for by the claimant would be to say, in effect, that the material for any structure may be maufactured in a foreign country, then' imported into the United States, fastened together into form for use as intended, and then exported with the benefit of drawback, as an article manufactured in the United States.
Upon this theory furniture imported in separate parts or pieces, as in the case of Hedden v. Richards (149 U. S., 346), could be fastened together into form for use and then exported for the benefit of drawback as articles manufactured in the United States.
This, in our judgment, would not only defeat the purpose of the statute, but would have the effect to encourage foreign rather than domestic manufactures, especially if such material could be manufactured in foreign countries cheaper than it could in the United States.
And while this would tend to promote our export trade in such articles and doubtless be of financial interest to such exporters, it certainly would not promote or encourage domestic manufactures.
The claimant or its officers could not have been misled by the statute, as they were bound to know the condition on which they could export the boxes for the benefit of drawback.
The regulation of the Treasury Department in allowing a drawback on the exportation of boxes likewise manufactured, as set forth in the findings, was not sufficiently long and continuous to bring it within the decisions of the Supreme Court in the case of Edwards v. Darby (12 Wheat., 206), United States v. Hill (120 U. S., 169, 182), and authorities there cited. “A regulation of a Department, however, can not repeal a statute.” (Merritt v. Cameron, 137 U. S., 542, 551.)
If we are correct in what we have said, it follows that the words “ articles wholly manufactured of materials imported on *104 which duties have been paid,” etc., mean, first, that such articles shall have been manufactured in the United States; second, that such articles shall have been wholly manufactured of imported materials on which duties have been paid, and third, that such manufacture includes, as a necessary part thereof, the manufacture or preparation of the materials therefor.
Applying what we have said to the case at bar, keeping in view the controlling purpose of the statute, we must conclude that the boxes exported were not manufactured in the United States; that the labor expended in the United States in nailing the shooks together and trimming the boxes was but the completion of the transformation or manufacture which began in Canada with the preparation of the material therefor, and the claimant is not entitled to recover.
We have not deemed it necessary to consider the question as to whether an allowance could be made for the nails, for the reason that while they were manufactured in the United States of imported steel rods on which duties were paid, they were not exported as such, but formed a part of the boxes which were not manufactured in the United States for the reasons stated.
We, however, have found the amount of duties paid on the steel rods, so in case of an appeal the question may be presented to the Supreme Court.
Nor have we deemed it necessary to consider what distinction, if any, there may be between shooks tied up in a 'Single bundle, each sufficient for a box, or tied up separately, as set forth in the findings, for the reason that the purpose of the statute could not be defeated by the manner in which the shooks were bundled for shipment, and for the further reason that the controverted question in this case is as to where the boxes were manufactured; and having reached a conclusion adverse to the claimant on this proposition, *the petition is dismissed.